STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE

                           SUPERIOR COURT DIVISION

COUNTY OF GUILFORD               12-CVS- 11352

| | |
|---|---|
| BRAD FARRIS,<br>MARIA FARRIS, AND<br>M.F., minor, by and through her<br>Guardian Ad Litem, ROBERT WALL,<br><br>         Plaintiffs,<br><br>v.<br><br>OAK RIDGE FOUNDATION,<br>INCORPORATED, successor in interest<br>by merger with OAK RIDGE MILITARY<br>ACADEMY, INC.,<br><br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

                                        **COMPLAINT**<br>                               **(JURY TRIAL DEMANDED)**

        Plaintiffs, Brad Farris, Maria Farris, and Robert Wall, as Guardian Ad Litem for M.F., a

minor, by and through Counsel, for their Complaint against Oak Ridge Military Academy, allege

as follows:

### PARTIES, JURISDICTION AND VENUE

        1.     Robert Wall is a citizen and resident of Forsyth County, and brings this action in

his representative capacity as the duly appointed Guardian Ad Litem for M.F., a minor who is

referred to in this Complaint as "M.F." to protect her identity.

        2.     Brad and Maria Farris, ("Mr. and Mrs. Farris"), are parents to M.F. and are

currently residents of Cleveland, Ohio.

        3.     Oak Ridge Foundation, Inc., d/b/a Oak Ridge Military Academy ("ORMA") is an

educational institution located in Oak Ridge, Guilford County, North Carolina, that was, upon

information and belief, receiving federal funding at all relevant times referenced herein.

4.     From October, 2011 through January, 2012, while she was just 14 years old, M.F. was enrolled as a boarding student at ORMA and was entrusted to the care and tutelage of ORMA.

5.     ORMA was acting in loco parentis at all relevant times hereto and voluntarily undertook an increased duty to care for M.F. while she was entrusted to its care.

6.     This Court has subject matter jurisdiction over this action as the controversy is well in excess of ten thousand dollars ($10,000.00) exclusive of interest and costs.

7.     This Court has personal jurisdiction over the disputes described herein.

8.     Venue is proper before this Court because the events giving rise to this action occurred within Guilford County, North Carolina.

## FACTUAL BACKGROUND

9.     Plaintiffs reallege and incorporate by reference the above Paragraphs as though fully set forth herein.

### *M.F.*

10.     From October 2011 to January 2012, while she was just fourteen (14) years old, M.F. was a student at ORMA and entrusted to their care and supervision.

11.     Prior to attending ORMA, M.F. attended elementary school in Ohio and Tennessee. M.F. spent 5th grade through 7th grade at St. Leo's Parish Catholic in Winston-Salem, North Carolina. In the fall of 2011, M.F. began 8th grade at Meadowlark Middle School in Winston-Salem, North Carolina.

12.     During her childhood, M.F. has suffered from a variety of social and psychological issues, including Attention Deficit Hyperactivity Disorder (ADHD) and occasional depression.

2

13.     Meadowlark Middle School was the first public school that M.F. attended, where she had trouble adjusting to the new environment, requiring special assistance and attention to both her academics, as well as personal issues she was experiencing, which included emotional and psychological issues. While at Meadowlark, M.F. struggled emotionally and academically, requiring greater attention than many other students.

14.     M.F.'s academic, emotional and social struggles worsened, causing M.F.'s parents, Mr. and Mrs. Farris, to become concerned that Meadowlark Middle School was not able to provide the structure that M.F. needed at such a critical time in her life.

15.     M.F.'s emotional health deteriorated, including a decline in her stability and well-being, and she was involuntarily placed in Old Vineyard Behavioral Health Services Hospitalization in Winston-Salem, NC program for seven (7) days.

16.     Obviously distraught, the Farris family began looking for alternative schools that could provide more structure for their young teenager and that were capable of addressing her troubled past.

17.     The Farrises explored a number of options, including ORMA which advertises itself as a military school for "troubled teenage girls" that are "susceptible to rebellion, misbehavior and even conditions such as ADHD."

18.     The representations made by ORMA interested the Farrises, particularly since M.F. exhibited rebellion, misbehavior, ADHD, and Depression.

19.     In October, 2012, the Farris family toured ORMA to consider it as a potential school for M.F.

3

*Oak Ridge Military Academy (ORMA)*

20.     ORMA holds itself out to be a military boarding school for boys and girls that provides students with structure and discipline. ORMA advertises its military school for girls as a "remedy" for troubled teenagers.

21.     ORMA promotes itself as a safe option for parents with troubled teenagers, promising that military schools are "among the safest of all possible education (sic) choices because of the structure and the personal accountability taught in the military school environment." ORMA's website states that, "[p]ositive adult interaction tends to be greater [in military schools] than that in other school environments and frequently is greater than that which parents are able to offer at home."

22.     After explaining their situation and concerns regarding M.F., Mr. and Mrs. Farris received similar verbal representations from school officials during their visit to, and tour of, the school, which assured them that ORMA was a safe, protective and remedial environment for M.F.

23.     ORMA was aware of M.F.'s issues and needs and confirmed to the Farrises that ORMA would provide the extra attention M.F. needed.

24.     Relying on the numerous representations made by ORMA, Mr. and Mrs. Farris believed ORMA when it promised it would provide the structure and guidance that M.F. needed and would be the "remedy" they were searching for (and that was advertised by ORMA).

25.     As a result of ORMA representations, M.F. was enrolled on October 31, 2011.

4

*"Structure" at ORMA*

26.    ORMA promotes a military structure in which the students are initially enrolled as recruits, promoted to cadets, and are ranked, reviewed, graded and disciplined in military style by other students and ORMA employees.

27.    ORMA claims to offer a college preparatory curriculum within a military structure that develops well-rounded young men and women who are prepared to succeed in college and have the self-discipline, integrity and leadership skills necessary to reach their potential in life.

28.    ORMA advertises its success in implementing a supervised military structure that molds its adolescents into people of noble character who are capable of high standards of behavior.

29.    ORMA's Corps of Cadets is organized as a battalion comprised of Companies. ORMA grades a cadet's rank and position (and ultimately his or her success) within the Corps as determined by academic and military performance, participation in ORMA activities, and demonstrated leadership potential.

30.    ORMA's military structure is further designed to have the "subordinate" cadets and recruits succumb to the instructions of the "superior" cadets. In fact, the ORMA "Cadet & Parent Handbook" (the "ORMA Handbook"), which governs the students' experience while at ORMA, indicates that the first tenant of "Leadership" is "Good followers make good leaders."

31.    Despite the obvious problems associated with young girls being ordered around by older (but still adolescent) boys, blindly succumbing to the instructions and orders of "superior" cadets is at the heart of the ORMA experience. In fact, it is a requirement.

5

32.    The ORMA Handbook indicates that the heart and soul of ORMA is its Corps of Cadets, based upon a "standard and attitude of structure and discipline," which includes the male cadets being granted the disciplinary authority.

33.    Females are disproportionally excluded from supervisory roles or positions of authority within the Corps of Cadets.

34.    There is a culture intentionally created at ORMA that dissuades female cadets from resisting or questioning the instructions received from male cadets, or speaking up about inappropriate conduct they may experience.  Early on, females learn that to resist or question instructions from male cadets will subject them to unfavorable and degrading treatment from their male superiors.

35.    In fact, the ORMA Handbook warns that "collective resistance to authority is far more serious than resistance by individuals acting alone."  The clear message to young female cadets is to keep quiet, follow orders (even if they are degrading, harmful, or offensive) and do not attempt to resist authority (particularly as a group).

36.    The ORMA Handbook has numerous other examples of requiring the "inferior" cadets (including female cadets) to defer and obey orders of "superior" male cadets (who are exclusively male), and requiring adolescent peers to dole out discipline and recommendations, including but not limited to the following references to peer oversight:

    a.    "When self-discipline is lacking, ... peer discipline, will be involved;"

    b.    "discipline from peers for insubordination; "

    c.    evaluations and recommendations should be expected from "superior" cadets prior to progressing in the academics or military ranks;

    d.    recruits are subject to correction by Cadet Leaders at all times;

6

e.      recruits must assume the position of attention when addressed by "superior" cadets;

f.      recruits must give the right of way to "superior" cadets;

g.      when walking with a senior ranking cadet, the senior is to the right and the lower ranking Cadet is to the left, abreast and in step; and

h.      discipline means a prompt, willing responsiveness to commands, orders and regulations from peers.

37.      The structure creates a culture of submission and fear in which subordinate female recruits and cadets were taught to blindly follow the instructions, orders and even ignore the sexual advances of "superior" male cadets.

38.      This culture of submission and fear is exacerbated by a lack of oversight of the "superior cadets" by ORMA faculty.

39.      ORMA willfully turns a blind eye to the inappropriate conduct of its "superior" male cadets within the unsupervised and dangerous disciplinary structure.

40.      Further aggravating the problem, ORMA struggles financially and is grossly understaffed for a boarding school entrusted with the care of "troubled" teenagers. As a result, ORMA has no choice but to rely heavily on the "superior" male cadets to instruct the inferior cadets.

41.      As a result, superior cadets act under the authority of ORMA, with explicit and implicit approval of their conduct, and are acting agents of the school.

42.      M.F. and other "inferior" cadets were instructed to obey their "superior" cadets' commands, largely because ORMA does not have the resources to supervise its cadets.

7

43.    Any female cadet that fails to blindly follow her "superiors" incurs tours (which would frequently include painful manual labor) and other hazing at the hands of the "superior" male cadets.

44.    ORMA sanctioned the use of tours and hazing by superior males to correct "inferior" female cadets that refused to blindly obey the instructions of "superior" male cadets, who were nothing more than children themselves.

*Pervasive Sexual Assault and Misconduct in Military Academies*

45.    Sexual assault has been a problem in United States military academies that has become an epidemic for decades.

46.    The epidemic of sexual assault in military academics has become so pervasive that the Department of Defense established the Sexual Assault Prevention and Response Program in 2005 to promote prevention, encourage increased reporting of the crime, and improve response capabilities for victims.

47.    The Department of Defense has released an Annual Report on Sexual Assault in the Military since that time to raise awareness to the issue of sexual assault under military academy structure.

48.    The most reported sexual crimes in United States military academies are rape, aggravated sexual assault, and wrongful sexual contact.

49.    At all times relevant hereto, upon information and belief, ORMA was aware of (or should have been aware of) the studies and reports regarding sexual assault under military academy structure.

50.    The number of sexual assaults in military academies reveals an epidemic of sanctioned violence, aggression and misogynistic behavior towards young, female cadets.

8

51.     At all times relevant hereto, ORMA was aware that the military academy structure created an increased risk of sexual assault on young females versus traditional educational and societal systems in which male peers are not encouraged, condoned and granted access to reprimand, punish and harass younger female peers.

52.     The Department of Defense has published studies addressing how military academies can implement prevention strategies, increase confidence in reporting, improve sexual assault response, and improve system accountability.

53.     The aforementioned affirmative steps to remedy the problem with sexual abuse in military academies are needed because of the inherent flaws in the military academy disciplinary structure, even when properly supervised by adult faculty, staff or military leadership.

54.     ORMA had no such proper or appropriate supervision in place.

55.     Upon information and belief, ORMA took no steps to avoid the problems identified by the Department of Defense.

56.     ORMA was on notice that it needed a proper supervisory system in place to address the inherent problems with the military structure, but failed to take the appropriate steps to do so.

57.     ORMA is underfunded, understaffed, and employs a willfully ignorant administration that is woefully inadequate to permit a military structure based on opposite sex peer review and punishment of its young, female cadets.

58.     ORMA was at all times relevant hereto acting in loco parentis and owed a special duty to M.F. as a result of its position of trust, care and responsibility.

9

59.    Aside from providing education, schools such as ORMA, particularly boarding schools, have a legal obligation to serve as caretakers of the children entrusted to it while students are at school and have a duty to keep the school safe.

60.    ORMA was expected (and promised) to provide a safe and secure living and environment.

### Sexual Harassment and Other Misconduct at ORMA

61.    At all relevant times while M.F. was at ORMA, all "superior" cadets in the Corps were male and were in the 10th grade or older.

62.    Upon her arrival to ORMA, M.F. was assigned to a "superior" cadet, known hereinafter as J.H.

63.    As her "superior" cadet, J.H. was charged with training M.F. to be an ORMA cadet, teaching her how to conduct herself as a proper military student, to instill into her the integrity of the military program, and to discipline her if she fell out of step with the military culture.

64.    J.H. was entrusted by ORMA to act as its agent and was given actual authority to act on its behalf, including but not limited to the power to punish and reward M.F., as well as provide significant input regarding her demotion and promotion in the school.

65.    ORMA was aware of M.F.'s previous social, psychological and developmental issues at the time it assigned her to J.H. and inserted her into the poorly-designed, underfunded and unsupervised military structure described herein.

66.    Immediately upon her arrival at ORMA, M.F. observed unfettered access of the "superior" male cadets to the girls' dormitory, including but not limited to during the night.

10

67.    ORMA permitted "superior" cadets unfettered access to the female recruits and "inferior" cadets.

68.    There was no substantive supervision of the girls' dorms during this time by any responsible or responsive adult, creating a situation in which it was clear to the "superior" male cadets that they could come and go as they pleased, without adult supervision, while tasked with their ORMA assigned duties of submitting subordinate female cadets to their discipline and control.

69.    There were no locks, security systems or reliable adult supervision to dissuade "superior" cadets from late night access to younger females that were entrusted to their care and supervision, whom they were to mold through fear and discipline.

70.    As a result of the "superior" male cadets' unfettered access to the girls' dormitory, the "superior" male cadets would simply walk out the front door of the boys' dormitory and walk in the front door of the girls' dormitory after they returned from a mandatory study hall, called "closed quarters."

71.    Within the first two weeks of arriving at ORMA and being assigned to J.H., J.H. took advantage of his position of power to begin an intimate and sexual relationship with M.F.

72.    At her young age of 14, M.F. was unable to consent to or reject a sexual relationship with a "superior" cadet, who was acting on behalf of ORMA, who she was instructed to obey and follow (to be considered a "good leader" or risk tours and demerits for failure to do so).

73.    J.H. pressured M.F. to have oral sex and sexual intercourse with him.

11

74.     When M.F. resisted, J.H. would force M.F. to perform oral sex on him and would not stop until she screamed. Even when she screamed, J.H. would often continue forcing M.F. to perform oral sex on him.

75.     By the fourth (4th) week of school, J.H. had simply begun exercising his unbridled authority and walking into M.F.'s room without invitation. M.F. often asked him to leave, but he would not. J.H. frequently spent entire nights in M.F.'s room.

76.     One night, when several fellow "superior" cadets accompanied J.H. to the girls' dormitory, one cadet told another male cadet, a minor hereinafter referred to as "M.A.", to take M.F. into an empty dorm room and "do whatever he wanted with her."

77.     On that particular night, M.A. was "in charge" of the recruits, which included M.F.

78.     J.H. and M.A. were acting on behalf of ORMA, with implied and express authority to act as its agents and representatives.

79.     Upon hearing J.H.'s instructions, M.F. asked M.A., as the "superior" cadet in charge, for permission to leave. M.A. told her that she was not allowed to leave. However, M.F., fearing what might happen next, attempted to break ranks and got up to leave anyway.

80.     M.A. then forcibly picked M.F. up against her will and took her into an empty room.

81.     While in the empty room, M.A. leaned M.F. against a table and began thrusting himself on her from behind.

82.     M.A. then put his hands in M.F.'s pants and tried to get inside her underwear. M.A. groped M.F.'s breasts and made repulsive sexual sounds before she was able to escape from the room.

12

83.    M.F. feared the "superior" male cadets because they were given authority by the school to act as "superiors."

84.    M.F. was told by a fellow female cadet, referred to herein as J.C., that there was no point in reporting the actions of the "superior" male cadets because the school never took action when similar incidents occurred in the past.

85.    M.F. observed the unfettered access the male cadets had to female cadets, without rebuke or retribution from ORMA, and similarly believed there was no benefit to reporting misconduct and risk being seen as insubordinate under the ORMA disciplinary structure.

86.    As a result, M.F. did not feel safe at ORMA and felt that she could not report any of these events to anyone at ORMA. ORMA's lack of supervision of its "superior" cadets, its written policies, and its failure to protect young female cadets confirmed that belief.

87.    During her stay at ORMA, M.F. witnessed and endured unacceptable and offensive behavior toward herself and other females at the hands of the "superior" cadets.

88.    For example, just before Christmas break, M.F. was groped in Algebra class by another "superior" male cadet, hereinafter referred to as "Z.L." In this case, M.F. refused to follow his instructions and Z.L. retaliated against her by rubbing her thigh and touching her breasts.

89.    Around the same time, M.F. witnessed another female cadet being forced to perform oral sex on a "superior" male cadet hereinafter referred to as "D.P."

90.    On that particular day, M.F. walked into her dorm room after class and saw the female cadet on her knees and crying. M.F. then saw D.P. force the female cadet's head down on him. D.P. was laughing and M.F. told him to "get out." D.P. left soon thereafter.

13

91.     Z.L., D.P. and J.H. were all acting under the authority of ORMA or, in the alternative, were permitted to behave in this manner because ORMA willfully turned a blind eye to their behavior.

92.     M.F. eventually had the courage to end the relationship with J.H., but she continued to fear reprisal and repercussions and frequently witnessed his and several other "superior" male cadets' continued routine access to the girls' dormitory, and inappropriate behavior.

93.     One night, after J.H. heard that M.F. had kissed another boy, he called her "pathetic" and told her she needed to "die in hell." J.H. a "superior" cadet, acting under express and implied authority by ORMA, then proceeded to punch M.F. in the face and stomach.

94.     On multiple occasions, J.H., angry that M.F. had broken up with him, threatened her by saying things like, "I'm going to rape you" and otherwise made it clear he would use his position of authority to her detriment.

### ORMA's Failure to Investigate or Remedy Student Misconduct

95.     During Thanksgiving break, M.F. parents became aware of some of the sexual misconduct at ORMA through viewing text messages on M.F.'s phone.

96.     M.F.'s mother, Mrs. Farris, reported this to the ORMA's Lieutenant Colonel Lewis ("Lt. Col. Lewis"). Lt. Col. Lewis told Mrs. Farris that "we'll take care of it."

97.     ORMA had the power and responsibility to take effective steps to reduce sexual assault and misconduct in the academy.

98.     Shortly thereafter, the school installed Velcro alarms on the dormitory doors which could be disabled by simply pulling the alarm from the Velcro strip.

14

99. The "alarm system" did not deter the "superior" male cadets from entering the girls' dormitory. In fact, it empowered them to know that the only security being applied was an easily removable velcro strip. Both the male and female cadets removed the alarms from doorways in order to enter and leave the dormitory as they pleased.

100. ORMA failed to take any steps reasonably calculated to protected the female cadets from the pressure from "superior" cadets.

*Retaliation*

101. In January 2012, M.F. was dismissed from ORMA for allegedly tampering with the "security system" and participated in a fight between cadets.

102. The preferred reason for her termination was pretextual and false.

103. Upon information and belief, M.F. was in fact dismissed in retaliation for her reporting of sexual misconduct, harassment, and illegal activities on campus, as well as the risk that she would reveal the faulty discipline structure of the academy.

104. Moreover, by the time she was dismissed, M.F. and her family were viewed as problematic because they refused to blindly follow the paternalistic and degrading structure promoted by ORMA that encouraged the degradation, assault and sexual mistreatment of young female cadets.

105. Upon information and belief, the same aggressions that violated M.F. and sexually assaulted her were rewarded, promoted and graduated, whereas M.F. was dismissed for being a "trouble maker."

106. After M.F. was dismissed, Mr. and Mrs. Farris were forced to send M.F. to an alternative facility in Florida, and address the problems she was experiencing as a result of her time at ORMA.

15

107. As a result, Mr. and Mrs. Farris have suffered economic harm in the loss of tuition paid to ORMA, the costs of sending M.F. to treatment in Florida, and post-dismissal costs to be proved at trial. M.F. has suffered harm as a result of the environment at ORMA, for which ORMA is responsible as stated herein. Additionally, the assault and battery themselves warrant significant damages.

COUNT ONE

VIOLATION OF TITLE IX FOR SEX DISCRIMINATION AND RETALIATION<br>(20 U.S.C. § 1681(a))

108. Plaintiffs reallege and incorporate by reference the above Paragraphs as though fully set forth herein.

109. ORMA is an education institution receiving federal financial assistance.

110. M.F. was enrolled as a full-time student at ORMA between October 2011 and January 2012.

111. While a student at ORMA, M.F. was subjected to harassment, including sexual harassment and assault, based on her gender, by "superior" male cadets, as fully set forth in the preceding paragraphs.

112. This sexual activity and behavior by the "superior" male cadets was directly related to M.F.'s gender, designed to harm her, and provoked acute feelings of humiliation and degradation.

113. The harassment M.F. experienced is based upon her being a female.

114. M.F. is a member of the class Title IX is designed to protect.

115. M.F. was physically threatened by sex-based conduct and statements by several "superior" male cadets.

16

116.    M.F. feared and was intimidated by the "superior" male cadets because they held positions of authority granted to them by ORMA.

117.    ORMA created a culture of sexual harassment that was tolerated and ignored.

118.    ORMA was made aware of the sexual harassment of its female cadets, and did nothing to prevent it.

119.    The sex-based and other unlawful harassment was severe and pervasive, objectionably offensive, created a hostile and abusive environment, and was designed to humiliate, ridicule, and/or intimidate M.F.

120.    The hostile environment at ORMA was the direct result of the "superior" male cadets' unlawful conduct, including, but not limited to, their sex-based behavior against M.F. and other young female cadets.

121.    ORMA lacked institutional control over, and failed to investigate and address the outrageous conduct of its agents, the "superior" male cadets.

122.    School officials with the ability to correct the behavior were aware of and ignored the offensive behavior and harassment.

123.    ORMA was aware of the pervasive sexual harassment at its school due to, among other things, female cadet complaints over the inappropriate treatment.

124.    ORMA was deliberately indifferent to the harassment, inappropriate treatment and offensive behavior.

125.    M.F. was always uncomfortable raising the "superior" male cadets' sexual conduct towards her, given concern over retaliation under the peer disciplinary structure (which ultimately proved to be a valid concern).

17

126. As a result, Mr. and Mrs. Farris ultimately reported the inappropriate sexual conduct and behavior to the head of ORMA, Lt. Col. Lewis.

127. Lt. Col. Lewis told Mrs. Farris that ORMA would take care of the problem related to the sexual misconduct.

128. Moreover, at that point, ORMA was on notice of the specific problems being expressed by M.F. and had an obligation to interview to access whether its female cadets were being treated and disciplined appropriately. ORMA failed to do so.

129. After receiving information about the sexual malfeasance, ORMA did nothing to alter the defective and harmful supervisory relationship among cadets.

130. Upon information and belief, ORMA failed to investigate the allegations made by Mrs. Farris.

131. Further, ORMA failed to install a sufficient security system or provide necessary supervision of its residential students.

132. ORMA failed and refused to modify its peer disciplinary structure despite notice of sexual interaction between M.F. and "superior" cadets.

133. ORMA had constructive and actual notice of the hostile environment and sexual harassment created by the "superior" male cadets.

134. Instead of investigating and remedying the situation, ORMA ratified the inappropriate conduct of its "superior" cadets and further discriminated against M.F. by permanently dismissing her from the school in retaliation for her allegations of sexual misconduct at ORMA.

135. ORMA had no legitimate reason for dismissing M.F. and any proffered reason is purely pretextual.

18

136.     As a direct and proximate result of the sexual harassment, hostile environment caused by the "superior" male cadets, whose conduct remained at all times under the control ORMA, and other violations of Title IX described herein, and as a result of the retaliation by ORMA, M.F. has suffered personal injuries, shame, humiliation and economic harm.

137.     As a direct and proximate result of the sexual harassment and hostile environment caused by the "superior" male cadets, whose conduct remained at all times under the control ORMA, and as a result of the retaliation by ORMA, M.F. has been damaged in excess of $10,000.00.

## COUNTS TWO AND THREE
### Assault and Battery

138.     Plaintiffs reallege and incorporate by reference the above Paragraphs as though fully set forth herein.

139.     During the fall of 2011, M.A., used his position of authority as a superior male cadet and the cadet "in charge," by threatening M.F. and making inappropriate physical advances toward M.F., including, but not limited to, taking her into an empty room in the girls' dormitory against her will.

140.     Once inside the room, M.A. leaned M.F. against a table and began thrusting himself on her from behind. M.A. then forcibly put his hands in M.F.'s pants and tried to get inside her underwear. M.A. then groped M.F.'s breasts before M.F. was able to escape from the room.

141.     Before Christmas break, Z.L., another superior male cadet groped M.F.'s thigh and breast after M.F. refused to follow Z.L.'s instructions.

142. On or about her last week at ORMA, J.H. used his authority to degrade and harm M.F. by threatening her with things like, "I'm going to rape you" and punching her in the face and stomach.

143. The words and actions of M.A., Z.L., and J.H. put M.F. in reasonable fear of imminent physical injury.

144. The threatening and touching of the superior male cadets were intentional.

145. M.F. did not consent to the threatening and harmful words or actions by the superior male cadets.

146. The superior male cadets were, at all relevant times during the assault and battery of M.F., acting within the scope of their authority and agency as a cadet of ORMA and all acts are within the scope of the authority bestowed upon them by ORMA and, as such, all such conduct is attributable to ORMA.

147. As a direct and proximate result of the continued assault and battery, which was either condoned by ORMA, ratified by ORMA, or by which occurred as a result of the negligence of ORMA as described elsewhere in this Complaint, M.F. suffered physical injuries and also suffered, and will continue to suffer from extreme mental distress, anguish, and trauma, and will require future medical and/or psychological care.

## COUNT FOUR
## NEGLIGENT SUPERVISION

148. Plaintiffs reallege and incorporate by reference the above Paragraphs as though fully set forth herein.

149. ORMA owed a duty to Plaintiffs to supervise the conduct of the cadets who were entrusted to enforce the rules and conduct with the boarding school.

20

150.    Upon information and belief, ORMA had knowledge that "superior" male cadets previously harassed and/or otherwise engaged in inappropriate conduct with inferior female cadets.

151.    The "superior" male cadets were acting on behalf of ORMA, with its implicit and explicit approval of their inappropriate and unlawful conduct.

152.    In December, 2011, ORMA had actual knowledge that "superior" male cadets were engaged in inappropriate conduct with inferior female cadets such as M.F.

153.    ORMA knew or should have known that its continued reliance on "superior" male cadets as supervisors and instructors to "inferior" cadets, coupled with its lack of adult supervision of troubled teenagers, created undue risk of harm to "inferior" cadets and made "inferior" cadets vulnerable to harassment and injury.

154.    Given ORMA's knowledge of the "superior" cadets' past and present conduct, it had a duty to protect its students, including M.F., from unlawful sexual harassment or other inappropriate conduct by fellow cadets.

155.    ORMA had the authority and ability to take corrective measures to prevent the harassment from occurring, but failed to properly supervise its residential students and "superior" male cadets.

156.    By failing to supervise its agents, including students and "superior" male cadets, ORMA caused several students, including M.F., to undergo abuse, sexual harassment, and subjected her to a hostile environment.

157.    As a direct consequence of ORMA's breach of its duties to Plaintiffs, M.F. has suffered physical harm, and her parents, Mr. and Mrs. Farris, have suffered both economic and emotional harm.

21

158.    As a direct and proximate result of the negligence shown by ORMA, as fully set forth above, Plaintiffs have been damaged in excess of $10,000.00.

**COUNT FIVE**
**NEGLIGENT MISREPRESENTATION**

159.    Plaintiffs reallege and incorporate by reference the above Paragraphs as though fully set forth herein.

160.    ORMA promoted itself to Mr. and Mrs. Farris as a military boarding school for boys and girls that provides students with structure, discipline, and a safe environment. ORMA promoted its military school for girls as a "remedy" for troubled teenage girls. These statements were false, were knowingly told to Mr. and Mrs. Farris to rely on them, and they did in fact rely upon them when they entrusted their teenage daughter to the care and tutelage of ORMA.

161.    ORMAs false statement regarding the structure, discipline, and safety of the school directly harmed M.F. by causing her to be subjected to a hostile environment and sexual harassment with little to no adult supervision.

162.    As an educational institution, ORMA owed a duty of care to be truthful in their dealings with Mr. and Mrs. Farris and to exercise due care with M.F.

163.    Mr. and Mrs. Farris reasonably relied upon the representations of ORMA and suffered a pecuniary loss of tuition and health care costs, as well as emotional harm as a result of ORMA's false misrepresentations.

164.    As a direct and proximate result of the negligence shown by ORMA, as fully set forth above, Mr. and Mrs. Farris have been damaged in excess of $10,000.00.

## COUNT SIX
## GROSS NEGLIGENCE

165. Plaintiffs reallege and incorporate by reference the above Paragraphs as though fully set forth herein.

166. Upon information and belief, ORMA knew, or should have known, about the conduct and ongoing behavior of the cadets, specifically the "superior" male cadets prior to the complaint made by Mrs. Farris. In December, 2011, when Mrs. Farris made a complaint to Lt. Col. Lewis, ORMA did in fact know about the inappropriate conduct and behavior of the "superior" male cadets.

167. ORMA failed to act or respond appropriately to the Farris' requests for help.

168. ORMA condoned the conduct by continuing to allow the school to be grossly understaffed, by continuing to allow "superior" male cadets to assume inappropriate authoritative positions over "inferior" cadets, and by failing to install sufficient security systems.

169. ORMA further condoned the activity of its students and officials by retaliating against M.F. and her parents through a permanent dismissal from the school.

170. As a direct and proximate result of the gross negligence shown by ORMA and its officials, as fully set forth above, Plaintiffs have been damaged in excess of $10,000.00.

## COUNT SEVEN
## NEGLIGENCE PER SE

171. North Carolina General Statutes section 14-27.7(a) provides that, "a person who is an agent or employee of any person, or institution, whether institution is private, charitable, or governmental, having custody of a victim of any age engages in vaginal intercourse or a sexual act with such victim, the defendant is guilty of a Class E felony." Under section 14-27.7(a), "[c]onsent is not a defense to a charge under this section."

23

172. ORMA had "custody" of M.F. as that term is used in section 14-27.7(a).

173. J.H. had duties assigned to him by ORMA, including nondelegable duties, to oversee, discipline and educate M.F.

174. J.H. was an agent of ORMA and was given actual and apparent authority to act on its behalf, while ORMA had custody of M.F.

175. J.H. engaged in vaginal intercourse and other sexual acts with M.F. in his capacity and authority as an agent of ORMA, as fully set forth in the preceding paragraphs.

176. ORMA became aware of the relationship and did nothing to prevent it, assure it ended, or otherwise punish J.H. for engaging in the inappropriate relationship.

177. As a student in the custody of ORMA, an educational institution, M.F. was a member of the class intended to be protected by section 14-27.7(a).

178. The harm M.F. suffered as a result of the conduct engaged in by J.H. is the type of harm section 14-27.7(a) is intended to eliminate.

179. Section 14-27.7(a) creates a duty that the statute was enacted to protect a class of persons which includes M.F.

180. ORMA committed a breach of the statutory duty that injured M.F. and which was of the nature contemplated in that statute.

181. The actions of J.H. were in violation of section 14-27.7(a) and such violations constitute negligence per se by the defendant.

182. The violation of the statute proximately caused M.F.'s injuries.

183. As a result of J.H. acting on behalf of ORMA, ORMA is liable for the violation of the statute and has committed negligence per se.

184.    As a direct and proximate result of the negligence shown by ORMA and its agents, as fully set forth above, Plaintiffs have been damaged in excess of $10,000.00.

**COUNT EIGHT**
FRAUD

185.    Plaintiffs reallege and incorporate by reference the above Paragraphs as though fully set forth herein.

186.    ORMA represented to Plaintiffs that ORMA was a military boarding school that would provide their troubled teenage daughter with structure, discipline, and safety.

187.    These statements and representations to Mr. and Mrs. Farris were false, and, upon information and belief, were made to Mr. and Mrs. Farris to induce them to rely on them, and they did in fact rely upon them.

188.    Given ORMA's status as an educational institution with over One Hundred Sixty (160) years of experience, Mr. and Mrs. Farris's reliance on the representations was reasonable.

189.    ORMA's false statements and representations directly harmed the Mr. and Mrs. Farris by subjecting M.F. to hostile and abusive environment, designed to humiliate, ridicule, and/or intimidate M.F., causing emotional harm to Mr. and Mrs. Farris and causing them to send M.F. for extensive mental health treatment after her time at ORMA.

190.    ORMA's conduct was willful, wanton, or, at minimum, in reckless disregard of M.F.'s well-being.

191.    As a direct and proximate result of ORMA's material and false representations, Mr. and Mrs. Farris have been damaged in excess of $10,000.00.

25

## COUNT NINE
### BREACH OF CONTRACT

192.  Plaintiffs reallege and incorporate by reference the above Paragraphs as though fully set forth herein.

193.  ORMA entered into a contractual relationship to provide educational services to M.F. in exchange for payment of tuition, room and board.

194.  In addition to the written promises made in its contracts with Plaintiffs, ORMA represented to Mr. and Mrs. Farris that ORMA was a military boarding school that would provide their teenage daughter with structure, discipline, and safety in exchange for tuition and other payments.

195.  In exchange for these promises, Mr. and Mrs. Farris paid ORMA a down payment and tuition which created an enforceable contract.

196.  During M.F.'s time at ORMA, the school breached its duty to perform under the contract, (including implied contract) by failing to provide structure, discipline, or safety, as fully set forth above.

197.  As a result of this breach, Mr. and Mrs. Farris have been economically harmed through the loss of the down payment and tuition for the 2011-2012 school year, as well as additional consequential damage to be proved at trial.

## COUNT TEN
### UNFAIR AND DECEPTIVE TRADE PRACTICE

198.  Plaintiffs reallege and incorporate by reference the above Paragraphs as though fully set forth herein.

199.  ORMA made numerous false representations to Mr. and Mrs. Farris including but not limited to the assertion that ORMA was a military boarding school that would provide their

26

teenage daughter with structure, discipline, and safety with knowledge that the school was grossly understaffed.

200.    Upon information and belief, at the time ORMA made those representations to Mr. and Mrs. Farris, ORMA had knowledge of prior sexual harassment and abuse among its cadets, and that the structure was not as it was advertised to potential students and their families.

201.    ORMA knew the representations it made regarding the services it promised to provide were false.

202.    Holding itself out as a safe and structured military school when it is grossly understaffed, relies on the authority of male cadets as "superiors" in an environment of troubled teenagers, and when it fails to adhere to the representations made both in advertisements and verbally to parents and potential students, is an unfair, unethical, and deceptive practice.

203.    Additionally, relying on the male cadets to fulfill the promises ORMA made regarding safety and education is unfair and deceptive in that ORMA had no intention to fulfill those obligations itself, or oversee the "superior" cadets to assume they fulfilled the responsibilities assigned to them.

204.    ORMA's actions were in or affecting commerce.

205.    ORMA's unfair and deceptive practice directly and proximately caused harm to Plaintiffs under N.C. Gen. Stat. § 75-1.1.

206.    Pursuant to N.C. Gen. Stat. § 75-1.1, Plaintiffs are entitled to recover treble damages and attorneys' fees as a result of ORMA's unfair and deceptive trade practices.

## COUNT ELEVEN
## PUNITIVE DAMAGES

207.    Plaintiffs reallege and incorporate by reference the above Paragraphs as though fully set forth herein.

27

208.    ORMA's conduct described herein displayed a conscious and intentional disregard of, and indifference to the rights and safety of others, including Plaintiffs, which Defendant knew or should have known was reasonably likely to result in injury, damage or other harm, which did result in harm to the Plaintiffs.

209.    ORMA's conduct was egregious, malicious, willful and wanton through causing, participating in and condoning the egregiously wrongful, malicious, willful and wanton conduct of others as fully set forth in the preceding paragraphs.

210.    As a result of ORMA's egregiously wrongful conduct, ORMA this Court should impose punitive damages in such amounts as may be awarded by a jury, pursuant to N.C. Gen. Stat. § 1D-1 et seq., as ORMA's liability may appear from the evidence as found by the trier of fact.

211.    Plaintiffs request an award of punitive damages in accordance with the laws of the State of North Carolina.

**WHEREFORE,** Plaintiffs demand judgment in their favor and against the Defendant and request as follows:

a.    That the Court award Plaintiffs all damages described herein and as shall be proved at trial;

b.    That the Court award Plaintiffs treble damages;

c.    That the Court award Plaintiffs' attorneys' fees;

d.    That the Court award Plaintiffs the costs associated with this action;

e.    That punitive damages be awarded against Defendant;

f.    That the Court award Plaintiffs such other and further relief as the Court deems just and proper; and

28

g.    That Plaintiffs be granted a jury trial as to all issues so triable.


This the 13th day of December, 2012.

_____
Nathan B. Atkinson, Esq.
N.C. State Bar No. 27695
Jessica L. Kimble, Esq.
N.C. State Bar No. 44523
SPILMAN THOMAS & BATTLE, PLLC
110 Oakwood Drive, Suite 500
Winston-Salem, NC 27103
Telephone:    (336) 725-4496
Facsimile:    (336) 725-4476

*Attorneys for Plaintiff*